**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANDREA GUIANEN and JEFFREY GUIANEN,    ) )<br>Plaintiffs,    ) ) | C.A. No. 25-262 Erie |
| v.    ) ) | District Judge Susan Paradise Baxter |
| STATE FARM MUTUAL AUTO INSURANCE COMPANY,    ) )<br>Defendant.    ) | |

**MEMORANDUM OPINION**

**I.    INTRODUCTION**

Plaintiffs Andrea Guianen ("Ms. Guianen") and Jeffrey Guianen ("Mr. Guianen"), her husband, initiated the present action by filing a complaint against Defendant State Farm Mutual Auto Insurance Company in the Court of Common Pleas of Erie County, Pennsylvania. [ECF No. 1-1]. The action was subsequently removed to this Court by a Notice of Removal filed by Defendant on August 19, 2025. [ECF No. 1].

This case arises out of an automobile accident that occurred on I-271 near Beechwood, Ohio, on March 26, 2022, while Plaintiffs were transporting their three children to a youth hockey tournament. (ECF No. 1-1, at ¶ 6). At the time, Ms. Guianen was driving Plaintiffs' vehicle in the righthand lane when the driver of a nearby Jeep Cherokee suddenly lost control while attempting to merge in front of Plaintiffs' vehicle, causing Plaintiffs' vehicle to collide with the Jeep. (Id. at ¶¶ 7-10).

1

### A.   Injuries and Medical Care

As a result of the accident, Mr. Guianen experienced wrist and knee pain, but did not suffer any fractures or structural damage. (Id. at ¶ 14). Ms. Guianen also suffered wrist and knee pain, but more significantly suffered pain in her lower back that was initially diagnosed on March 29, 2022, as "lumbago with sciatica," for which she received steroid injections and prescriptions for muscle relaxers and topical pain patches. (Id. ¶¶ 15-18). One month later, on April 29, 2022, Ms. Guianen was ordered a Neuromuscular and Muscular Electrical Stimulation unit ("NMES unit") to address muscle wasting and weakness in her back and legs, and was prescribed Tramadol and a muscle relaxer for her pain. (Id. ¶¶ 20-23). On May 13, 2022, Ms. Guianen received another steroid injection, and on May 17, 2022, she underwent an MRI of her lumbar spine that revealed only mild degenerative changes. (Id. ¶¶ 25-26). Ms. Guianen also received a two-month course of chiropractic treatment, from April 6, 2022 through May 31, 2022. (Id. ¶¶ 27-28).

After enduring more than a year of unresolved symptoms and pain, Ms. Guianen underwent an MRI of her right hip on November 4, 2023, which revealed a two-inch anterior superior labral tear on her right side, for which she was referred to an orthopedic surgeon, Dr. Deimel, who first prescribed physical therapy. (Id. ¶¶ 30-34). During physical therapy, the therapist noted that Ms. Guianen had weakness in her left hip as well and referred her for an MRI of her left hip. (Id. ¶ 37). On January 31, 2024, Dr. Deimel reviewed the results of the MRI, which revealed "evidence of anterior superior labral tear" in Ms. Guianen's left hip. (Id. ¶¶ 38-39).

As a result of these new findings, coupled with the lack of improvement in either hip during physical therapy, Ms. Guianen ultimately underwent arthroscopic labral repair on her

right hip on March 28, 2024, and had the same procedure performed on her left hip on May 9, 2024. (Id. ¶¶ 40-41).

### B.      Insurance Coverage

At the time of the accident, Plaintiffs were insured by a policy of automobile insurance issued by Defendant. (Id. ¶ 63). On March 26, 2022, Defendant sent a letter to Ms. Guianen advising, in part, that "If it is determined that the other driver is not insured, or is underinsured, your uninsured motorist, or underinsured motorist coverage may apply." (Id. ¶ 64). It was subsequently determined that the driver who caused the accident was uninsured. (Id. ¶ 65). As a result, on March 26, 2024, Plaintiffs' counsel notified Defendant that Ms. Guianen was asserting an uninsured motorist claim. (Id. ¶ 66). Defendant responded on March 27, 2024, confirming that "on the date of loss [Plaintiffs] carried Uninsured Motorist Coverage limits of $100,000 each person/$300,000 each accident with the stacking option on three vehicles." (Id. at ¶ 67).

On August 9, 2024, Plaintiffs sent a letter to Defendant demanding coverage for their injuries, and enclosing copies of their medical records. (Id. at ¶ 69). On August 22, 2024, Plaintiffs' counsel followed up by emailing a complete set of the relevant medical records to Defendant's claims division. (Id. at ¶ 70). On October 15, 2024, Defendant's counsel requested Mr. Guianen's medical treatment records, which were ultimately provided by Plaintiffs' counsel on December 3, 2024. (Id. at ¶¶ 75-76). On December 4, 2024, Defendant requested that both Mr. and Ms. Guianen submit to examinations under oath, which were later held on February 7, 2025 (Id. at ¶¶ 77-78).

On March 6, 2025, Plaintiffs' counsel wrote to Defendant's counsel asking when Defendant was expected to make a decision regarding Plaintiffs' claim. (Id. at ¶ 81). Defendant's counsel responded the same day stating that he was "awaiting settlement authority." (Id. at ¶ 82).

On March 14, 2025, Plaintiffs' counsel advised Defendant's counsel that Plaintiffs intended to file suit, noting that Defendant had not made any offer despite having received "complete medical records, an expert report and demand letter … last summer" and having given "Statements Under Oath" during the "first week of February." (Id. at ¶ 83).

On March 17, 2025, Defendant's counsel replied that Defendant was still investigating the claim because it was concerned about "the 15-month gap in [Ms. Guianen's] treatment between the date of loss on March 25, 2022, and her undergoing an MRI of her hip on November 4, 2023," and it asked to be "provided a full copy of the records from Primary Care of Erie…." (Id. at ¶ 84). On March 20, 2025, a nurse employed by Plaintiffs' counsel sent an updated copy of Ms. Guianen's medical records to Defendant "along with a detailed explanation of the treatment she received during the 15-month 'gap' [Defendant] was concerned about," and explained that Primary Care Associates of Erie had mistakenly failed to provide a complete copy of the records previously. (Id. at ¶ 85).

On May 9, 2025, Plaintiffs' counsel provided to Defendant an updated demand for payment of the full policy limits of $ 300,000.00 to resolve Ms. Guianen's uninsured motorist claim. (Id. at ¶ 87). On May 16, 2025, Defendant's counsel replied that Defendant still did not have enough information to evaluate Ms. Guianen's claim, particularly with regard to "the labral tears in her bilateral hips which resulted in the two hip surgeries, and also "has not had the opportunity to have a medical doctor perform an Independent Medical Examination of Ms. Guianen…." (Id. at ¶ 88).

The present action was subsequently filed with the Erie County Court on or about July 15, 2025, asserting claims of breach of contract (Count I), bad faith (Count II), and loss of consortium (Count III).

On August 26, 2025, Defendant filed a motion to dismiss Plaintiffs' bad faith claim at Count II of the complaint [ECF No. 6], arguing that Plaintiffs' allegations fail to state a cognizable bad faith claim. Plaintiffs have filed a brief in opposition to Defendant's motion [ECF No. 8], to which Defendant has filed a reply brief [ECF No. 9]. This matter is now ripe for consideration.

## II.    DISCUSSION

Plaintiffs claim that Defendant has acted in bad faith in violation of 42 Pa. C.S. § 8371 by failing and refusing to make any payment to Plaintiffs for their covered loss under their uninsured motorists coverage.

The Pennsylvania Superior Court has defined bad faith in the context of an insurance coverage dispute as:

> any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.,* good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Palek v State Farm Fire and Cas. Ins., 2020 WL 5077461, at *7 (W.D. Pa. Aug. 26, 2020), quoting Terletsky v. Prudential Prop. and Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (quoting Black's Law Dictionary 139 (6th ed. 1990)).

"'To prevail in a bad faith insurance claim pursuant to [42 Pa. C.S.A.] Section 8371, a plaintiff must demonstrate, by clear and convincing evidence, (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the claim.'" Gibson v. State Farm Mut. Auto Ins. Co., 994 F.3d 182, 190-91 (3d Cir. 2021), quoting Rancosky v. Washington Nat'l Ins. Co., 170 A.3d 364, 377 (Pa. 2017). The Third Circuit has also recognized that bad faith conduct

extends to "a frivolous or unfounded refusal to pay, lack of investigation into the facts, or a failure to communicate with the insured." Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193 F.3d 742, 751 n.9 (3d Cir. 1999). However, "[a] complaint does not state a bad faith claim upon which relief can be granted where the bad faith claim is based only on 'bare-bones conclusory allegations' of bad faith." Kline v. Progressive Corp., 2019 WL 6875601, at *2 (M.D. Pa. Dec. 17, 2019) (quotation omitted); Satterfield v. Gov't Ins. Emp. Co., 2020 WL 7229763, at *2 (E.D. Pa. Dec. 8, 2020) (citing cases); Toner v. GEICO Ins. Co., 262 F. Supp. 3d 200, 208 (E.D. Pa. 2017) (Plaintiff "must plead specific facts as evidence of bad faith and cannot rely on conclusory statements" or "merely say that an insurer acted unfairly").

Here, Defendant first argues that "the bulk of Plaintiffs' facts supporting the bad faith claim come in the form of a barebones list of legal conclusions that State Farm was somehow acting unreasonably in investigating the claim (which it was entitled to do as a matter of law)." (ECF No. 7, at p. 6). In support of this argument, however, Defendant references only two of the eleven bad faith allegations specified in paragraph 119 of the complaint (¶¶ 119(g) and (j)), while overlooking the more substantive allegations of ¶¶ 119(a)-(e), which cite the following actions as evidence of Defendant's bad faith:

1.    Refusing to make a good faith offer because it 'still does not have enough information to fully evaluate' [Ms. Guianen]'s injuries when… Ms. Guianen provided every document and medical record requested and [Defendant] NEVER requested Ms. Guianen sign any additional authorization(s) or identified what other information would be 'enough' to allow it to fully evaluate her injuries. (ECF No. 1-1, at ¶119(a)).

2.    Refusing to make a good faith offer because it 'still does not have enough information to fully evaluate' [Ms. Guianen]'s injuries when… [Defendant] NEVER had sought an authorization from Ms. Guianen to speak with her treating surgeon. (Id. at ¶119(b)).

3.    Refusing to make a good faith offer because it 'has not had the opportunity to have a medical doctor perform an Independent Medical Examination of Ms. Guianen and then offer an opinion as to her injuries and the causation thereof' … when [Defendant] has NEVER requested an IME of Ms. Guianen. (Id. at ¶119(c)).

4.    Refusing to make a good faith offer without hiring a qualified orthopedic surgeon to review Ms. Guianen's medical records, and conduct an examination to determine whether the labral tears in her bilateral hips which resulted in the two hip surgeries was caused by the uninsured motorist collision of March 26, 2022. (Id. at ¶119(d)).

5.    Refusing to make a good faith offer after paying the entire medical benefit for certain medical care required by Ms. Guianen related to her injuries caused by the uninsured motorist collision of March 26, 2022. (Id. at ¶119(e)).[1]

These allegations, in particular, are far from a "barebones list of legal conclusions," as they encapsulate the well-pleaded allegations of the preceding paragraphs of the complaint, which must be viewed in a light most favorable to Plaintiffs. Nonetheless, Defendant challenges the legitimacy of those allegations, arguing that "a cursory review of the complaint reveals that the investigation was delayed by Plaintiffs' own conduct, despite their suggestion that they 'fully complied' with the investigation, Compl. ¶ 66, and that they provided 'every document and medical record requested[,]' Compl. ¶ 119(a)." (ECF No. 7, at p. 8).

At the heart of Defendant's argument is its claim that Plaintiffs have never provided "complete" medical records because no records have been produced for the 15-month "gap"

---

[1] The Court recognizes that Defendant's prior acceptance of its obligation to provide coverage for Ms. Guianen's medical care under the first-party benefits portion of its policy does not preclude Defendant from later raising the issue of causation with regard to its provision of uninsured motorist benefits. See Pantelis v. Erie Ins. Exchange, 890 A.2d 1063 (Pa. Super. 2006). Thus, the Court agrees with Defendant that, in order to maintain a bad faith claim, Plaintiffs must show more than a mere inconsistency between the Defendant's handling of the first-party and the third-party uninsured motorist benefits.

between May 2022 and November 2023.[2] As a result, Defendant contends that it is "objectively unreasonable for Plaintiffs to claim that [Defendant] should have completed its evaluation" without such records; that it "could not have asked for authorizations for medical records when Plaintiffs themselves have not identified who[,] if anyone[,] [Ms. Guianen] treated with during this 15-month period;" and that "an IME (or orthopedic records review) would be of little value without the records from this 15-month period and/or attestation that Plaintiff wife did in fact not treat for 15 months." (ECF No. 9, at p. 2). However, this argument necessarily presupposes that such records, in fact, exist and that Plaintiffs have either been withholding them or been less than diligent in providing them. Such a presupposition is unsupported by the detailed allegations of the complaint and, in particular, calls into question the veracity, rather than the sufficiency, of Plaintiffs' allegation that Ms. Guianen has "provided every document and medical record requested...." (ECF No. 1-1, at ¶ 119(a)). This is not appropriate at the pleading stage.

Viewing Plaintiffs' allegations in a light most favorable to Plaintiffs, the Court finds that the complaint presents a plausible claim for bad faith that should proceed to discovery. Accordingly, Defendant's motion to dismiss Plaintiffs' bad faith claim will be denied.

An appropriate Order follows.

---

2  The Court notes that the cited period from May 2022 to November 2023 actually consists of 18 months, rather than 15 months; however, for purposes of Defendant's motion, the Court will defer to Defendant's repeated reference to a "15-month gap" in medical records/treatment.